AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Virginia



In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
1852 Cedar Cove Way #101, Woodbridge, Virginia 22191,
which is a unit within a three-level building

)
)
)
)
)
)

Case No. 1:17-sw-678

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) , 846 | Conspiracy to distribute methamphetamine, a Schedule II controlled substance. |
| 18 U.S.C. § 924(c) | Possession of a firearm in furtherance of drug trafficking. |
| 18 U.S.C. § 922(g)(1) | Felon in possession of firearms and/or ammunition. |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

· AUSA Carina A. Cuellar

*Applicant's signature*

Michael A. Fernald, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/8/2017

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, VA

Hon. Theresa Carroll Buchanan, US Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is 1852 Cedar Cover Way #101, Woodbridge, Virginia 22191 (the "PREMISES"). The PREMISES is described as a as a unit within a three level building. The building has off-white siding on the top two levels with white windows and blue shutters. The first level of the building has brick siding and white garage doors. The number "1852" is in gold posted above a blue entrance door of what appears to be a shared entrance. "101" is posted to the right of a doorbell outside of the shared entrance. In addition, the search shall be extended to any locked safe or container within the PREMISES.



16

## ATTACHMENT B

*Property to be seized*

The items to be seized are fruits, evidence, records and information relating to, contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846(a) (distribution and possession with intent to distribute methamphetamine, and conspiracy to distribute methamphetamine) and Title 18, United States Code, Section 924(c) (possession of a firearm in furtherance of drug trafficking), and Title 18, United States Code, Section 922(g)(1) (felon in possession of firearms and/or ammunition), including, but not limited to:

a) Illegal narcotics and drugs, in particular methamphetamine, a Schedule II controlled substance;

b) United States currency derived from the sale of controlled substances;

c) Money ledgers, and other documents noting the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or money was possessed or transferred;

d) Bank statements and records, which might reflect the proceeds generated from the sale of controlled substances;

e) Indicia of control, or ownership of the premises and things described in this warrant, such as utility bills, telephone bills, loan payment receipts, canceled envelopes and keys, photographs, and bank records;

f) Firearms and ammunition;

17

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN THE MATTER OF THE SEARCH OF:

**1852 Cedar Cove Way #101, Woodbridge,
Virginia 22191, which is a unit within a
three-level building**

Case No. 1:17-sw- *6 78*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Michael A. Fernald, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 1852 Cedar Cove

Way #101, Woodbridge, Virginia 22191, hereinafter "PREMISES," further described in

Attachment A, for the things described in Attachment B.  As further explained herein, there is

probable cause to support that TEODORO JOSE GONZALES has conspired to distribute

methamphetamine within the Eastern District of Virginia and elsewhere.  Further, there is

probable cause to support that GONZALES used the PREMISES to distribute and store

methamphetamine.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") and have been so employed since 2014.  I am currently assigned to the Falls

Church II Field Office within the Washington Field Division, which is located in the Eastern

District of Virginia.  Prior to my employment with ATF, I was a sworn police officer in the

Commonwealth of Virginia from 2003 to 2014 and served in multiple capacities.

3.     While with the ATF, I have participated in the investigation of narcotics traffickers and possessors. Many of these investigations led to the arrest and conviction of narcotics dealers. In the course of conducting these investigations, I have used several different kinds of investigative techniques, including: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and, the analysis of financial documents and records.

4.     Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two communicating party's cellular telephones or other devices. It is also commonly understood and known that many people in our society communicate with their cellular telephones and other devices in both manners.

5.     Based on my training and experience, I also know that information gained through the obtaining of data stored in the part of the cellular telephone and other devices routinely referred to as an address book or contacts file in an individual's cellular telephone and other devices, as well as the recovery of text messages sent or received from that cellular telephone and other devices can lead to identifying accomplices, or witnesses to the crimes

2

committed by the individual. Based on my training experience, I also know that know that individuals frequently maintain personal records and documents in an electronic format on laptop computers and/or smart phones. Finally, I know that individuals who ship and receive packages containing controlled substances often use electronic devices to access websites to check the status of the packages. I know that this search history can be recovered from electronic devices.

6.      Further, based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences and on their property additional quantities of the illicit drugs being distributed. These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection. Drug traffickers also commonly maintain at their residences and on their property paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances.

7.      Based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences money ledgers and other documents, which note the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or when money was possessed or transferred. I also know that methamphetamine distributors frequently possess firearms on their person or in their homes in order to protect themselves from being robbed of their controlled substances and drug proceeds.

8.      This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

9.      During the course of this investigation, ATF and Drug Enforcement

3

Administration ("DEA") special agents have debriefed and used two cooperating sources ("CS-1" and "CS-2") and a cooperating defendant ("CD-1"). Regardless of the cooperating sources' and cooperating defendant's gender, the cooperating sources' and cooperating defendant will be referred to in the masculine gender. The cooperating sources and cooperating defendant have proven to be reliable and credible and have provided information against their own penal interest. The information provided by the cooperating sources and cooperating defendant have been corroborated in this investigation by administrative subpoenas, checks in law enforcement systems, and a review of text messages.

10.    In or around July 2017, the Prince William County Police Department ("PWCPD") received a Crime Solvers Tip that "TJ GONZALES" of the PREMISES, with telephone number 202-431-3743 ("Subject Telephone Number") was selling methamphetamine from his apartment. The tip stated GONZALES holds at least six ounces of methamphetamine daily. Law enforcement queried the Subject Telephone Number and confirmed GONZALES was in frequent contact with CS-1.

11.    CS-1 began working with law enforcement in September 2017. CS-1 has no criminal history and is an admitted drug user. Further, CS-1 was a member of the instant conspiracy to distribute methamphetamine. CS-1 has agreed to cooperate with law enforcement because he hopes to receive a reduced sentence. During debriefs, CS-1 admitted that he distributed methamphetamine within the Eastern District of Virginia and elsewhere.

**PROBABLE CAUSE**

A.    Background of the Investigation

12.    In or around September 2017, a cooperating defendant ("CD-1") was arrested for

4

possession with intent to distribute methamphetamine. CD-1 is an admitted drug user and was a member of the instant conspiracy to distribute methamphetamine. In a post-arrest interview, CD-1 stated he provided an ounce (28 grams) of crystal methamphetamine to GONZALES; however, GONZALES never paid CD-1.

13.     In a consent search of CS-1's mobile phone, the above statement was potentially corroborated in a chat conversation between CS-1 and GONZALES on or about September 4, 2017. In this message, GONZALES stated, "I'm about to pull a fast one on [CD-1] my nig."

14.     Beginning in or around September 2017, CS-1 reported to law enforcement that a co-conspirator ("Co-Conspirator 1") was involved in the distribution of methamphetamine in the Eastern District of Virginia. Specifically, CS-1 reported that Co-Conspirator 1 had access to pound quantities of methamphetamine, which are shipped to Co-Conspirator 1 from California. Further, CS-1 has seen Co-Conspirator 1 with methamphetamine at a residence in Alexandria, Virginia, which is located within the Eastern District of Virginia, on at least five occasions.

B.     CS-1 Conspired with GONZALES to Purchase Methamphetamine from Co-Conspirator 1 and Controlled Purchase from GONZALES

15.     During the week of September 24, 2017, CS-1 informed law enforcement that he purchased quantities of methamphetamine from Co-Conspirator 1 with other individuals. One of these individuals was identified as "TJ" by CS-1. CS-1 later confirmed "TJ" to be GONZALES, when law enforcement displayed a photograph of GONZALES to CS-1.

16.     Further, CS-1 informed law enforcement that he and GONZALES were supposed to provide their share of purchase money to Co-Conspirator 1 for a pound of methamphetamine in the near future. Specifically, CS-1 reported that he and GONZALES both agreed to pay Co-Conspirator 1 for one (1) pound (16 ounces or 453 grams) of crystal methamphetamine, which

5

would be shipped from California in the upcoming week. Once Co-Conspirator 1 received the shipment, CS-1 and GONZALES would each obtain eight (8) ounces (226 grams) from Co-Conspirator 1.

17.    At the direction and supervision of law enforcement, CS-1 contacted GONZALES and arranged to purchase a quantity of methamphetamine from GONZALES at the PREMISES, which is located in the Eastern District of Virginia. Prior to and following the controlled purchase, CS-1 was searched for contraband with negative results. Law enforcement conducted surveillance of the PREMISES. During the surveillance, law enforcement observed GONZALES exit and enter the PREMISES. Additionally, a video recording device was used and recorded GONZALES in the PREMISES. This controlled purchase was recorded and I can confirm the recording corroborates CS-1's statements.

18.    During the transaction, GONZALES informed CS-1 that he had a revolver upstairs in the PREMISES and described it as a .38 special. GONZALES and CS-1 also discussed a Sig-Sauer pistol and an extended "clip" (magazine). Further, GONZALES reported he was trying to sell one of his guns and reported he was going to sell his Glock. A review of GONZALES' criminal history reveals that he has been convicted of four felonies and is therefore prohibited from possessing firearms.

19.    CS-1 ordered a half of an ounce of methamphetamine from GONZALES, but GONZALES only had a small amount left. CS-1 complained that he needed 14 grams and now he had to find another 7 grams. GONZALES then said all he had was a gram and that he was waiting on a "Pokémon" to bring him the rest. GONZALES said he could obtain the rest of the methamphetamine for CS-1. GONZALES informed CS-1 that he does not keep

6

methamphetamine at the PREMISES because he is paranoid. GONZALES told CS-1 that he (CS-1) needed to get a "Pokémon" to sell the methamphetamine for CS-1. GONZALES reported that he could obtain a half of an ounce of methamphetamine from another co-conspirator, but CS-1 informed GONZALES that he (CS-1) did not deal with the other co-conspirator.

20.     CS-1 provided GONZALES with $100 in ATF agent cashier funds to purchase the methamphetamine. CS-1 also owed $700 to GONZALES from a prior methamphetamine transaction and paid back his debt with ATF agent cashier funds. The day prior to this transaction, GONZALES had "fronted" 14 grams of crystal methamphetamine to CS-1 and CS-1 had to pay off that debt prior to purchasing additional crystal methamphetamine.

21.     Law enforcement instructed CS-1 to discuss the future payment to Co-Conspirator 1 during this transaction. CS-1 informed GONZALES that he had a good relationship with Co-Conspirator 1. CS-1 also informed GONZALES that he was going to drop his money to Co-Conspirator 1 in the near future.

C.     Controlled Purchase of Methamphetamine from Co-Conspirator 1

22.     During the week of September 24, 2017, at the direction and supervision of law enforcement, CS-1 arranged to purchase one (1) ounce (28 grams) of methamphetamine from Co-Conspirator 1 at Co-Conspirator 1's residence. Additionally, CS-1 arranged with Co-Conspirator 1 to provide a partial payment to Co-Conspirator 1 for the procurement of approximately one (1) pound of crystal methamphetamine, which CS-1 and GONZALES were purchasing together. CS-1 arranged this purchase by communicating with Co-Conspirator 1 via text message and phone calls. Prior to and following the controlled purchase, CS-1 was searched

for contraband with negative results. Law enforcement conducted surveillance of Co-Conspirator 1's residence. During the surveillance, law enforcement observed Co-Conspirator 1 exit and enter his residence. Additionally, a video recording device was used and recorded Co-Conspirator 1 in his residence with a large quantity of methamphetamine and a digital scale. According to CS-1, Co-Conspirator 1 provided CS-1 with the methamphetamine in exchange for $2,600 (pre-recorded evidence funds). This controlled purchase was recorded and I can confirm the recording corroborates CS-1's statements.

23. Law enforcement conducted a preliminary field-test, which resulted in a positive response for methamphetamine.

D. CS-1 and Co-Conspirator 1 Statements Regarding Conversations and Meetings with GONZALES

24. CS-1 stated that the morning after making the partial payment to Co-Conspirator 1 described above, Co-Conspirator 1 informed him that GONZALES had made his payment as well. Co-Conspirator 1 informed CS-1 that GONZALES had paid Co-Conspirator 1 $2,700, a slightly larger payment than CS-1 paid for his half of the pound of crystal methamphetamine.

E. CS-1 Meeting with Co-Conspirator 1 in October 2017

25. During the week of October 2, 2017, CS-1 met with Co-Conspirator 1 at the direction and supervision of law enforcement. During the meeting, Co-Conspirator 1 told CS-1 that a package containing methamphetamine would arrive in Virginia by Friday October 6, 2017. During the meeting, Co-Conspirator 1 gave CS-1 approximately one (1) gram of methamphetamine. Prior to and following the meeting, CS-1 was searched for contraband with negative results. Additionally, a video recording device was used and recorded Co-Conspirator 1 during the meeting. This meeting was recorded and law enforcement can confirm the recording

8

corroborates CS-1's statements.

     F.     Traffic Stop of Co-Conspirator 1 on October 6, 2017

     26.     In September 2017, law enforcement learned from another cooperating source ("CS-2") that Co-Conspirator 1 receives packages at the Manila Oriental Market in Springfield, Virginia, which is located within the Eastern District of Virginia. CS-2 has proven reliable in his interactions with law enforcement; however, I do not currently have in my possession CS-2's criminal history. On October 6, 2017, law enforcement obtained an administrative subpoena for all packages shipped to the Manila Oriental Market. A review of those packages identified UPS parcel 1Z4F49A81335512905, which law enforcement observed delivered on October 6, 2017. Law enforcement later observed Co-Conspirator 1 drive to and enter the Manila Oriental Market. Co-Conspirator 1 was then observed leaving the Manila Oriental Market with a package. Co-Conspirator 1 then exited the area at a high rate of speed, which prevented law enforcement surveillance from following his movements.

     27.     Law enforcement later located Co-Conspirator 1 at the Residence Inn by Marriott located at 6412 Backlick Road, Springfield, Virginia. Prior to law enforcement obtaining a search warrant for the hotel room, law enforcement observed Co-Conspirator 1 drive away from the hotel. Shortly thereafter, law enforcement executed a traffic stop of Co-Conspirator 1's vehicle. Co-Conspirator 1's vehicle was pulled over because his front window only permitted 32% light passage. Under Virginia law, windows must permit at least 50% light passage. Upon being pulled over, law enforcement asked Co-Conspirator 1 to exit his vehicle and enter a law enforcement vehicle, so that law enforcement could run his license and registration. While in the vehicle, Co-Conspirator 1 appeared nervous and uncomfortable. When law enforcement asked

Co-Conspirator 1 whether he had any controlled substances in his vehicle, including methamphetamine, Co-Conspirator 1 stated he did not. When law enforcement asked permission to search his vehicle, Co-Conspirator 1 denied permission.

28.    After Co-Conspirator 1 denied permission to search his vehicle, law enforcement used a trained law enforcement K-9 to walk around the vehicle. The K-9 alerted on the driver's side door handle. Law enforcement then searched the vehicle and located an estimated 500 grams of crystal methamphetamine. Law enforcement then arrested Co-Conspirator 1.

29.    After Co-Conspirator 1 was arrested, he was read his *Miranda* rights and waived those rights. Co-Conspirator 1 acknowledged that he possessed methamphetamine and had been receiving packages containing methamphetamine in the mail. Co-Conspirator 1 estimated 500 grams of crystal methamphetamine was in his possession to be delivered to two different individuals. Co-Conspirator 1 informed law enforcement that he had received $2,700 from GONZALES and $2,600 from another CS-1 to procure a pound of crystal methamphetamine from a source in California. Co-Conspirator 1 stated that both GONZALES and CS-1 were supposed to each obtain eight (8) ounces of crystal methamphetamine, but the package was a little light. Thus, Co-Conspirator 1 only planned to give GONZALES and CS-1 seven (7) ounces each. Co-Conspirator 1 agreed to place recorded telephone calls to each of these individuals so that they would come pick up their purchased crystal methamphetamine in a law enforcement controlled scenario.

G.    GONZALES Arrested at Co-Conspirator 1's Residence on October 6, 2017

30.    On October 6, 2017, law enforcement surveillance was established at the PREMISES. GONZALES was observed entering and exiting the PREMISES.

10

31.     Co-Conspirator 1 contacted GONZALES at the Subject Telephone Number on
October 6, 2017. Co-Conspirator 1 informed GONZALES that everything was good and asked
if he wanted to meet up later. Co-Conspirator 1 had also informed law enforcement that
GONZALES had been trying to sell a Sig-Sauer pistol (corroborated by CS-1 above). Co-
Conspirator 1 asked if the pistol was still available and GONZALES reported he would talk to
Co-Conspirator 1 at his residence and that his brother-in-law had the pistol. GONZALES said he
would find out who had the firearm and get back with Co-Conspirator 1. In a second recorded
phone call, GONZALEZ said he was waiting on his brother-in-law to obtain the pistol. Co-
Conspirator 1 then asked if anyone else had something available and GONZALES informed him
that another individual had one and specified, "Remember that one with the laser? That one."
GONZALES also offered to send a picture of the firearm he was talking about.

32.     Later, GONZALES called Co-Conspirator 1 from the Subject Telephone Number
and informed him that he was about to get off at Co-Conspirator 1's exit. A short time later,
GONZALES and another co-conspirator ("Co-Conspirator 2"), who were observed earlier at the
PREMISES, arrived in a dark colored vehicle. GONZALES and Co-Conspirator 2 were
detained as they approached the front door of Co-Conspirator 1's residence. Law enforcement
seized a plastic shopping bag carried by Co-Conspirator 2. This plastic bag contained a box with
new zip-lock plastic bags. Based on my training and experience, I know these zip-log plastic
bags are used to package crystal methamphetamine and other controlled substances. Further, a
satchel carried by Co-Conspirator 2, was found to contain a quantity of crystal
methamphetamine, which I estimate to be five (5) grams. A crystal methamphetamine smoking
device was also located in Co-Conspirator 2's pocket.

11

33.     GONZALES was advised of his *Miranda* rights, which he waived.  During a custodial-interview, GONZALES admitted to being an unlawful and habitual user of crystal methamphetamine.  GONZALES denied any further involvement in the conspiracy; however, he admitted he had picked up unknown quantities of crystal methamphetamine from Co-Conspirator 1 prior to this date.  GONZALES reported he had just purchased the drug-packaging materials described above at the Hobby Lobby and was bringing them to Co-Conspirator 1.  GONZALES had no explanation for why Co-Conspirator 1 would need the zip-lock bags.  Further, GONZALES admitted he had "gone in" with other people to purchase crystal methamphetamine in the past, but was unclear on the quantity purchased or amount invested by him.

34.     In a probable cause search of the vehicle that GONZALES and Co-Conspirator 2 arrived in, law enforcement observed two empty firearm holsters.  Further, GONZALES cellular phone was seized from him during a search incident to arrest.

35.     Co-Conspirator 2 was also advised of his *Miranda* rights, which he waived. During a custodial-interview, Co-Conspirator 2 admitted to being an unlawful and habitual user of crystal methamphetamine.  Co-Conspirator 2 admitted to knowing Co-Conspirator 1 and GONZALES for several years.  Co-Conspirator 2 stated GONZALES had prepared the crystal methamphetamine smoking device in his pocket for him to smoke and Co-Conspirator 2 admitted to using crystal methamphetamine inside the PREMISES earlier.  Co-Conspirator 2 stated that he had overheard a conversation between GONZALES and Co-Conspirator 1 in which Co-Conspirator 1 was trying to obtain a firearm from GONZALES.  Co-Conspirator 2 told GONZALES not to bring the firearm because it would only lead to violence or trouble for them.  Co-Conspirator 2 also stated that while driving to Co-Conspirator 1's residence,

12

GONZALES informed him he was going to "pick up his half." Co-Conspirator 2 stated there was a hidden compartment behind the CD player of the vehicle they travelled in and he denied seeing a firearm in it, but stated he did see a holster on the rear floorboard of the vehicle. Co-Conspirator 2 stated GONZALES purchased the box of zip-lock bags, but that when they both exited the vehicle, GONZALES asked Co-Conspirator 2 to carry the bag. Co-Conspirator 2 denied having any knowledge of the crystal methamphetamine in his satchel. He said both GONZALES and Co-Conspirator 1 let him smoke crystal methamphetamine for free when he is with them. Finally, Co-Conspirator 2 admitted he has observed both Co-Conspirator 1 and GONZALES weighing out quantities of methamphetamine on scales in both GONZALES' and Co-Conspirator 1's residence.

H.     Review of Conversations between CS-1 and GONZALES

36.     CS-1 granted consent to law enforcement to search his cellular phone. Based on my training, experience, and knowledge of the case, I believe that the conversations between CS-1 and GONZALES are related to the distribution and use of controlled substances. Below, I detail some of the conversations.

37.     On August 9, 2017, GONZALES contacted CS-1 and stated, "Yo, I heard you lookin, I gotchu on deck, holla at me."

38.     On September 1, 2017, CS-1 asked GONZALES if he has anything to sell and GONZALES responds, "Dry as the desert." GONZALES then stated, "Well I'll be good in an hour bro." CS-1 tells GONZALES that he has someone that will pay $1500 for a zip (ounce). GONZALES responds, "I believe you my nig, I'm trying all my connects."

13

39.     On September 5, 2017, GONZALES asked CS-1, "Will Co-Conspirator 1 hook you up?" This is referring to Co-Conspirator 1. CS-1 responded, "He is asleep I got a hook last night he was already up for three (ounces). I already put in my order." GONZALES replied on September 6, 2017, "Yo I just saw this, can I put one in" and CS-1 replied, "I can sell you one of mine."

40.     On September 18, 2017, CS-1 asked GONZALES, "Did you get yours from [Co-Conspirator 1]?" GONZALES responded, "Waiting for his call." In SMS conversations between CS-1 and Co-Conspirator 1, around this period, Co-Conspirator 1 stated, "I talk to the sources she said she will have it tomorrow but needs to send it." CS-1 asked to expedite it and offered to pay extra to get it the same day. CS-1 further reported, "I have someone who has it, they waiting on my half, we splitting it." Co-Conspirator 1 stated, "That's 9 for u, 362 apiece." CS-1 stated he would check with the homie (GONZALES). On September 19, 2017, GONZALES responded, "Mission accomplished. Not a lot but so so."

I.     Gonzales' Vehicle is Registered to Him at the PREMISES

41.     Upon locating GONZALES' vehicle outside of the PREMISES, law enforcement conducted a query of his 2017 Toyota pickup truck's registration, XXX3612, in the Virginia Department of Motor Vehicles. The vehicle was registered to TEODORO JOSE STA INES GONZALES at the PREMISES.

## CONCLUSION

42.     Based on the information detailed above including that (a) law enforcement made a controlled purchase of a substance that field-tested positive for methamphetamine at the PREMISES, (b) law enforcement observed GONZALES exit the PREMISES on the evening of

14

October 6, just prior to driving to Co-Conspirator 1's residence to pick up his half of a pound of

methamphetamine, and (c) as well as my general knowledge of narcotics dealers, I believe that

evidence of drug trafficking including, but not limited to, ledgers, records, notes, controlled

substances, drug paraphernalia, U.S. currency, and electronics containing text messages, ledgers,

and internet search history related to tracking the sent packages are located in the PREMISES. I

therefore submit that this affidavit supports probable cause for a warrant to search the PREMISES

described in Attachment A and seize the items described in Attachment B.


Michael A. Fernald
Special Agent
ATF


Subscribed and sworn to before me this _____ day of October 2017.

Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

15

## ATTACHMENT A

*Property to be searched*

The property to be searched is 1852 Cedar Cover Way #101, Woodbridge, Virginia 22191 (the "PREMISES"). The PREMISES is described as a as a unit within a three level building. The building has off-white siding on the top two levels with white windows and blue shutters. The first level of the building has brick siding and white garage doors. The number "1852" is in gold posted above a blue entrance door of what appears to be a shared entrance. "101" is posted to the right of a doorbell outside of the shared entrance. In addition, the search shall be extended to any locked safe or container within the PREMISES.



16

## ATTACHMENT B

*Property to be seized*

The items to be seized are fruits, evidence, records and information relating to,
contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1)
and 846(a) (distribution and possession with intent to distribute methamphetamine, and
conspiracy to distribute methamphetamine) and Title 18, United States Code, Section 924(c)
(possession of a firearm in furtherance of drug trafficking), and Title 18, United States Code,
Section 922(g)(1) (felon in possession of firearms and/or ammunition), including, but not limited
to:

a) Illegal narcotics and drugs, in particular methamphetamine, a Schedule II
   controlled substance;

b) United States currency derived from the sale of controlled substances;

c) Money ledgers, and other documents noting the price, quantity, date and/or times
   when controlled substances were purchased, possessed, transferred, distributed,
   sold or concealed, or money was possessed or transferred;

d) Bank statements and records, which might reflect the proceeds generated from the
   sale of controlled substances;

e) Indicia of control, or ownership of the premises and things described in this
   warrant, such as utility bills, telephone bills, loan payment receipts, canceled
   envelopes and keys, photographs, and bank records;

f) Firearms and ammunition;

17

g)  Packages sent through the mail, the United Parcel Service, FedEx, etc..; and

h)  Cellular phones, computers, and other electronic storage media or digital devices.